SAMUEL A. PINKLEY, Appellee, *vs.* THE CHICAGO AND
EASTERN ILLINOIS RAILROAD COMPANY, Appellant.

*Opinion filed October 28, 1910.*

1. MASTER AND SERVANT—*a master is not an insurer of safety
of his servant.* A master is not an insurer of the safety of his ser-
vant, and can only be held liable for consequences which he might
reasonably be expected to anticipate as a result of his conduct.

2. SAME—*when law does not impose duty to warn servant of
danger.* If the master does not know, or by exercising ordinary
diligence could not have known, of the danger of a servant suffer-
ing a poisoning of the system, resulting in permanent injury, from
the handling of timbers treated with a coal tar preparation con-
taining creosote, the law does not impose upon him the duty of
warning his servant of such danger.

3. SAME—*master not required to warn his servant of danger
known to servant.* If a servant knows that the handling of tim-
bers treated with a coal tar preparation containing creosote will
produce a burning of the skin sufficient to cause it to peel off, the
master owes him no duty to warn him of such danger, and the
fact that the servant becomes permanently poisoned as a result of
handling the timbers does not render the master liable unless he
knew, or by the exercise of ordinary care could have known, that
such a consequence might result and failed to warn the servant.

4. SAME—*what must be shown before servant can recover for
permanent injury from poisoning.* Before a servant can recover
for permanent injury from poisoning, caused by handling timbers
treated with a coal tar preparation containing creosote, he must
prove that the injury was so caused, that he did not know of the
danger of poisoning but that the master did know or by the exer-
cise of ordinary care could have known and yet failed to give
warning to the servant.

HAND, FARMER and CARTER, JJ., dissenting.

APPEAL from the Appellate Court for the Fourth Dis-
trict;—heard in that court on appeal from the Circuit Court
of Fayette county; the Hon. SAMUEL L. DWIGHT, Judge,
presiding.

BROWN & BURNSIDE, for appellant.

B. W. HENRY, and ALBERT & MATHENY, for appellee.

Mr. JUSTICE COOKE delivered the opinion of the court:

Samuel A. Pinkley, the appellee, brought an action of case in the circuit court of Fayette county against the Chicago and Eastern Illinois Railroad Company, the appellant, to recover damages for personal injuries sustained by him while in the employ of appellant. A declaration consisting of two counts was filed, alleging that on August 6, 1907, while appellee was in the employ of appellant as a servant in its supply yards at St. Elmo, Illinois, appellant received at its supply yards a car-load of green yellow-pine piling, freshly treated with creosote; that appellant, well knowing the dangers likely to result from handling piling so treated with creosote, through its foreman negligently and carelessly ordered appellee and his co-laborers to unload the piling from the car with their hands and with cant hooks, and plaintiff having no knowledge of the danger attendant upon such work, and in the exercise of ordinary care, worked with said piling with his hands and cant hooks during the whole of said day in and about unloading the same from the car under the orders and directions of said foreman, and by reason thereof became poisoned and diseased and permanently injured. Appellant filed the general issue and a trial was had before a jury, which resulted in a verdict finding appellant guilty and fixing appellee's damages at $600. After overruling appellant's motion for a new trial the court rendered judgment upon the verdict. Appellant prosecuted an appeal to the Appellate Court for the Fourth District, where the judgment of the circuit court was affirmed. Appellant was granted a certificate of importance by the Appellate Court and has brought the case here for review.

At the close of appellee's evidence in chief, and again at the close of all the evidence in the case, appellant offered, and the court refused, an instruction directing a verdict for

246—24

appellant. The action of the court in refusing to give the peremptory instruction offered at the close of all the evidence is the principal ground urged by appellant for reversal of the judgments of the Appellate and circuit courts. Appellant contends that the instruction should have been given, first, because the evidence failed to disclose any negligence on the part of appellant; and second, because the appellee assumed the risk attendant upon unloading the timbers from the car. In considering this assignment of error the only question open for our consideration is, whether there is in this record any evidence which, with the inferences reasonably to be drawn therefrom, tends to establish these two elements of the case in appellee's favor.

Resolving all controverted facts in favor of appellee, the record discloses that at and prior to the time appellee sustained the injuries hereinafter mentioned, the appellant maintained at St. Elmo, in this State, supply yards for the storage and distribution of various kinds of material required in constructing and repairing its tracks and bridges. A number of men were employed at these yards whose work consisted almost wholly in loading and unloading the material received there. These men worked under the supervision of a foreman. A portion of the material received at and distributed from the yards consisted of timbers covered or treated with a coal-tar preparation containing creosote. On June 3, 1907, appellee commenced working for appellant in the supply yards. He was fifty-two years of age and had spent several years in working for railroad companies but had had no experience in handling material treated with creosote. During the month of July, 1907, appellant received at the supply yards at least two car-loads of timbers treated with the coal-tar preparation, which appellee assisted in unloading. He also assisted in loading at least one car-load of timbers so treated. On these occasions he observed that the fumes from the preparation with which the timbers were covered caused a burning sensation

and sometimes caused the skin on the face and arms to blister and peel off, the effect being similar to that of sunburn. Appellee and several of his fellow-workmen had been affected in this manner to some extent prior to August 6 while handling material treated with the coal-tar preparation. It was also a common remark among the men employed at the yards that the "Black Jack," as they called it, was "hot stuff," and appellee had heard them speak of it as being "hot stuff." On the morning of August 6, 1907, the foreman directed appellee and several other employees to unload piling from a coal car which had been received at the yards. The timbers had been recently treated with the preparation, which was soft and viscid, and in that respect differed from the timbers theretofore handled by appellee, upon which the preparation had hardened. It was a very hot day and the preparation was dripping from the timbers and from the corners of the car, the testimony showing that such condition was not unusual when timbers treated with the preparation were exposed to the rays of the sun in hot weather. The foreman furnished a can of vaseline and advised the men to use the vaseline on their faces, stating that the timbers were green and had been freshly treated and that he thought the vaseline would prevent the preparation hurting them. The workmen, including appellee, used the vaseline as directed and proceeded to unload the car under the direction of the foreman. They did not handle the timbers with their hands, but each was furnished with a cant hook to use in moving or lifting the timbers. Handspikes were also furnished and used in the work, and after the car had been partially unloaded and it became necessary to roll the timbers up skids to get them out of the car, a rope was fastened around the timber and a portion of the men pulled on the rope while others remained in the car and assisted with the cant hooks and handspikes. This method of unloading the car on August 6 had been the usual method of unloading large timbers from

cars at these yards before and ever since appellee had commenced working there. Most of the men engaged in the work experienced the burning sensation which they had previously experienced in handling timbers treated with the coal-tar preparation, and some of them had their faces, hands and arms blistered to such an extent that the skin peeled off, but all except appellee continued working at the supply yards, and thereafter handled timbers treated with creosote, when called upon to do so, without suffering any injury except the temporary pain and inconvenience from the burning and peeling off of the skin on their faces, hands and arms. Appellee, however, was unable to sleep during the night of August 6 on account of the pain in his face, hands and arms, and the next morning his face and arms were red and swollen. He returned to the yards and asked the foreman what kind of work he would be required to perform that morning. Upon being informed that there were timbers treated with creosote to be handled he refused to go to work, stating that he was already injured enough from handling such timbers. He was thereupon discharged and another employee was called to take his place. This employee worked a portion of the day and then quit, stating upon the witness stand in this case that he quit because it was too hot for him. He also sustained some burns that day from which he fully recovered within five or six days without consulting a physician. Appellee, after quitting his employment, returned home and applied camphor ice salve to his face and arms. The next day numerous white pustules appeared on his face and arms and in his nostrils, and he consulted a physician, under whose treatment he continued for a period of from three to four months. He then discontinued treatment with the physician, and has since used various proprietary remedies in attempting to be cured, but without success. The burning sensation has been present almost constantly ever since August 6, and pustules and sores around his mouth and in

his nostrils, which at times almost disappear and then break out anew, have caused him great pain and annoyance. The burns on his arms had at the time of the trial healed, leaving scars, and his face was then better than it had been since receiving the injuries.

Dr. Whiteford, the physician who treated appellee, was called as a witness in his behalf, and testified that when appellee first consulted him he was suffering from dermatitis venenata, which the witness described as an irritation of the skin caused by some irritant, in which a redness and swelling and a sense of burning are usually present, and that the trouble has developed into eczema. He further testified that dermatitis venenata could be caused by various substances and that it would be impossible to tell from an examination of a person the cause of this disease, but that he questioned appellee, and upon learning from him that he had been working with creosote and that his face had been reddened by it, the witness concluded that creosote must have been the primary cause of the disease. The other medical testimony in the case is also to the effect that appellee is now afflicted with eczema and that it is a very obstinate disease and is not often cured. The medical testimony also shows that creosote is a poison, and that, when highly concentrated and in large quantities, it may throw off fumes which, coming in contact with the skin or membrane of the nose, may cause an irritation thereof, manifested by a reddening of the skin and a burning sensation, and that this condition may or may not be followed by white blisters or pustules, depending on the individual and the extent to which the tissues are affected; that eczema may develop from any burn or scald or may be produced by any irritating cause, and that burns from creosote could result in eczema.

The testimony of these physicians with reference to the effects of creosote or creosote fumes upon the human body was to a large extent theoretical. None of them except

Dr. Bohart, a witness for appellant, were familiar with the preparation used as a preservative for wood, and the composition of the substance used on the timbers does not appear in the record. Dr. Bohart, who resided at Chicago and who was familiar with the coal-tar preparation used on timbers, testified that he was chief surgeon of appellant and was also surgeon for the New York Central and Lake Shore and Michigan Southern railroads; that reports of all injuries to men working for appellant were sent to him by the local surgeons, and that this was the first report of poisoning from the preparation received by him or coming to his knowledge. Dr. Whiteford, appellee's physician, testified that he was not familiar with the compound used for treating timbers but was familiar with the creosote used as a medicine, which is extracted from beechwood while that used as a preservative for wood is extracted from coal, and that he had seen pure creosote; that he had had no experience with the fumes of medicinal or pure creosote burning persons, never knew of creosote fumes causing burns, and never knew of anyone being injured by the fumes of creosote, unless it was this one case. Dr. Higginbottom, another witness called by appellee, testified that he was not familiar with the compound used on timbers, and that his sole experience in treating injuries from creosote was in the treatment of two men whose faces and hands had been blistered while using paint containing creosote, and that those cases yielded to treatment. The only other medical testimony introduced by appellee was that of Dr. Greer. He testified that his experience was limited entirely to medicinal (or beechwood) creosote; that he had received burns from it, and had treated patients whose gums had been slightly burnt from the use of beechwood creosote in the mouth.

The record shows that on the same day the appellee received his injuries several men in the employ of the Illinois Central Railroad Company received burns from handling

timbers treated with a preparation containing creosote, necessitating medical treatment, but that the injuries of all except one of those men were of a temporary nature and readily yielded to treatment; that in the case of the one excepted, his eyes were affected and became sore and his face and arms were blistered, this condition remaining for about three weeks, and after being apparently cured, returning the following spring.

It is a matter of common knowledge that creosote is in quite general use as a preservative for timbers used in bridges and as a preservative for poles used by telephone and telegraph companies and by railroads using electricity as a motive power, and the record in this case shows specifically that timbers and poles treated with the coal-tar preparation containing creosote have been for a number of years used by appellant and by the Clover Leaf and the New York Central railroad companies and by the Illinois Traction System, and that wooden blocks treated with the preparation are used for street paving in the city of Chicago, some of the men handling these blocks with gloves and others with the bare hands without injury.

The negligent act complained of in this case was the act of the foreman in directing appellee to unload the piling from the car with his hands and with cant hooks. In view of the cause to which appellee attributes his injuries, such act could only be negligent upon proof, first, that the preparation with which the timbers had been treated was poisonous and liable to injure a person engaged in handling the timbers; second, that appellant knew, or by exercising ordinary diligence might have known, that it was poisonous and capable of producing injury; and third, that appellee did not know that it was poisonous and likely to injure him and did not have equal opportunities with appellant of knowing thereof at the time he was injured. (*Montgomery Coal Co. v. Barringer,* 218 Ill. 327; *Elgin, Joliet and Eastern Railway Co. v. Myers,* 226 id. 358; *McCormick*

*Machine Co.* v. *Zakzewski,* 220 id. 522.) Such proof would have established a duty resting on appellant to warn appellee of the danger before exposing him to the risk, and, accompanied by proof that such warning was not given, would have established the negligence charged in the declaration. That the preparation and the fumes therefrom were poisonous and did produce the injuries of which appellee complains must be regarded as established; that the preparation and the fumes arising therefrom were liable to blister the skin, cause the skin to peel off and produce a burning sensation, and that appellant had knowledge thereof, must be regarded as established; but the record discloses that appellee also knew that such injuries were likely to follow from handling the piling. His counsel, in their argument filed in this court, in discussing appellee's knowledge of the preparation used on the timbers, say: "He did know that it would smart and burn and cause the skin to blister and peel. But that was and is not the danger complained of. The danger complained of was poisoning of the system, resulting in permanent injury." And, "He did know it would redden the skin, smart and burn and blister,—that it was hot stuff; but he did not know it was dangerous in the sense that an abundance of it breathed into the lungs and taken into the system would permeate the whole system and create systematic poisoning; nor did he know that this burning and parching of the skin and mucous membrane would result in eczema." The record in this case therefore fails to establish any duty owing by appellant to warn appellee, before or at the time of ordering him to assist in unloading the piling from the car, that the substance with which the timbers had been treated was liable to blister the skin, cause the skin to peel off and produce a burning sensation, and for such injuries it is clear that appellee could not recover.

Does the fact that the injuries which appellee received were more serious than he anticipated and resulted in a

disease of a permanent nature render appellant liable in this case? In our judgment, under the facts disclosed by the record, it does not. The record shows that appellant, as well as other companies, had been using this coal-tar preparation on timbers for a number of years and fails to disclose any injuries other than blistering and peeling off of the skin, except in the case of appellee and an employee of the Illinois Central Railroad Company on the same day. Out of about 125 men who had worked for appellant and had handled timbers treated with creosote, appellee was the only one who ever claimed to have been permanently injured by the creosote or creosote fumes. None of the men working with appellee on August 6 suffered any injuries from working with the piling, other than the burning sensation and the blistering and peeling off of the skin. So far as the record discloses appellee was the first person to sustain any serious or permanent injuries from handling timbers treated with creosote during the many years this substance has been in use as a preservative for wood. Under such circumstances, a finding that appellant knew, or by exercising ordinary diligence might have known, that the coal-tar preparation was liable to produce the injuries of which the appellee complains, is manifestly without any evidence whatever to support it. If the appellant did not know, or by exercising ordinary diligence could not have known, that such injuries were liable to result, then the law did not impose any duty upon it to warn appellee of the danger of receiving such injuries, before or at the time of giving the order which appellee alleges was negligently given.

A master is not an insurer of the safety of his servant, and he can only be held liable for consequences which he may reasonably be expected to anticipate as a result of his conduct. In *Fent* v. *Toledo, Peoria and Warsaw Railway Co.* 59 Ill. 349, in considering the liability of a railroad company for damages from fire caused by sparks from

passing engines, we quoted with approval the following language from 2 Parsons on Contracts, (1st ed.) p. 456: "Every defendant shall be held liable for all of those consequences which might have been foreseen and expected as the result of his conduct, but not for those which he could not have foreseen and was therefore under no moral obligation to take into consideration." In *Shugart* v. *Egan,* 83 Ill. 56, we said that this language quoted from Parsons on Contracts would seem to be equally as applicable to actions founded on torts as to those accruing upon contracts. In discussing damages for which a defendant may be held liable and damages for which he is not liable, we said in *Braun* v. *Craven,* 175 Ill. 401: "The principle is, damages which are recoverable for negligence must be such as are the natural and reasonable results of defendant's acts, and the consequences must be such as in the ordinary course of things would flow from the acts and could be reasonably anticipated as a result thereof. Proximate damages are such as are the ordinary and natural results of the omission or commission of acts of negligence and such as are usual and might have been reasonably expected. Remote damages are such as are the unusual and unexpected result not reasonably to be anticipated from an accidental or unusual combination of circumstances,—a result beyond and over which the negligent party has no control. The law regards only the direct and proximate results of negligent acts as creating a liability against a defendant." There is in this record no evidence tending to show that appellant could reasonably have been expected to anticipate that appellee would be seriously or permanently injured in obeying the order to assist in unloading the piling from the car, and under the principle announced in the foregoing cases decided by this court the appellant cannot be held liable for those injuries.

A case very similar in principle to the case at bar is that of *Gould* v. *Slater Woolen Co.* 147 Mass. 315. In that

case Frances E. Gould brought an action against the Slater
Woolen Company to recover damages for injuries alleged
to have been sustained by her in consequence of handling
certain cloths purchased of the defendant and which con-
tained certain poisonous dyes. The trial court directed a
verdict for the defendant on the ground that there was no
evidence upon which the defendant could be held liable.
According to the testimony of the expert witnesses intro-
duced by the plaintiff, it had never been shown until after
the plaintiff received her injuries that any cases of poison-
ing had occurred like the plaintiff's, and the Supreme Court
of Massachusetts, in sustaining the action of the trial court
in directing a verdict for the defendant, said: "For all
that appears, the plaintiff's was the first instance of injury
that ever was known to arise from the cause alleged in
the declaration. All that the plaintiff showed against the
defendant was that it used an article for dyeing its cloths
which was the most common mordant used in wool dyeing,
which was also used very extensively in dyeing stockings
black, which, so far as then known, had never caused in-
jury to anybody who merely handled the cloths, and which
the defendant did not know or suppose, and had no reason
to know or suppose, to be injurious; and under these cir-
cumstances, although there was evidence tending to show
that, in point of fact, the plaintiff was injured by merely
handling the cloths, this was not a result which the defend-
ant was bound or ought to have contemplated as likely to
happen." When the facts in the *Gould case* are compared
with the case at bar, the decision of the Supreme Court of
Massachusetts, which is in harmony with the decisions of
this court above cited, is peculiarly fitting ·as an authority
that the circuit court should have directed a verdict for
appellant.

Appellant also complains of the action of the trial court
in giving, modifying and refusing instructions. What we
have said in discussing the action of the court in refusing

to direct a verdict for appellant will serve as a sufficient guide for the trial court in passing upon the instructions of which complaint is made should they be offered upon another trial of this cause.

On account of the error of the trial court in refusing the peremptory instruction offered by appellant at the close of all the evidence in the case, the judgments of the. Appellate and circuit courts will be· reversed and the cause will be remanded to the circuit court for a new trial.

*Reversed and remanded.*

HAND, FARMER and CARTER, JJ., dissenting.