## Thomaso Bianco, alias Tom White, Appellee, v. A. C. O'Laughlin Company, Appellant.

### Gen. No. 23,605.

1. MASTER AND SERVANT, § 94*—*when master liable for injury to servant.* The master is not an insurer of the safety of his servant and he can only be held liable for consequences which he may reasonably be expected to anticipate as a result of his conduct.

2. MASTER AND SERVANT, § 191*—*when master not under duty to warn servant.* A master is not bound to warn a servant who is engaged in handling an air pressure whitewashing machine with another laborer, who is working the pump, of the danger of his getting his eye full of whitewash, resulting in the loss of the sight thereof, due to the sudden expulsion of the air upon disconnection of the hose from the machine for the purpose of finding out what is stopping the flow of the liquid, without shutting off the stopcock which keeps back the air and liquid, where an injury of such a nature had never before been known.

Appeal from the Circuit Court of Cook county; the Hon. ROBERT E. CROWE, Judge, presiding. Heard in this court at the October term, 1917. Reversed with finding of fact. Opinion filed March 5, 1918. *Certiorari* denied by Supreme Court (making opinion final).

CHARLES E. HECKLER, for appellant; C. W. LAMBORN, of counsel.

CHARLES A. SCOTT, for appellee.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

MR. PRESIDING JUSTICE HOLDOM delivered the opinion of the court.

This is a case between master and servant and is for personal injuries suffered by plaintiff, as he claims, through negligence attributable to defendant.

A trial before court and jury resulted in a verdict and judgment for $6,250, and defendant brings the cause here for review by appeal.

Plaintiff was a general laborer employed by defendant in connection with the operation of its stone quarry property in the Township of Proviso. On the east side of the quarry was a mill in which stone taken from the quarry was crushed. There was a shop for repairing tools, an office building and a superintendent's house opposite the mill, and in connection with its quarry and mill defendant operated a farm of about 39 acres upon which hay was the prevailing crop. There was a solid board fence about 5½ feet high opposite the superintendent's house, from which point it extended west for about 400 feet and separated the highway from the quarry pit. At the time plaintiff was injured he was spraying whitewash over the side of this board fence next to the highway.

On the day of the accident plaintiff and another laborer were directed by the superintendent to take the whitewashing machine and whitewash the board fence. The whitewashing machine consists of a cast-iron stand mounted on a board. On the left side of the support is a pump, which is operated by hand. This pump works on the same principle as an ordinary well pump and consists of a piston and a plunger on the end of the piston, both working by means of a handle in a cylinder or pump stock with the necessary valves to control the lifting of the liquid. Attached to the bottom of the pump is a rubber hose about 2 inches in diameter called the intake hose, which is inserted in the barrel or bucket containing the liquid to be sprayed. Stretched over the end of this intake hose, which is

inserted in the container, is a wire netting with a fine mesh, designed to strain the liquid as it is sucked in by the pump and to prevent any insoluble substances from passing through the pump. The liquid passes through the pump and out through a discharge pipe on the right side of the pump. Resting on top of this discharge pipe and having an opening at its lower end connecting therewith is a hollow iron cylinder about 4 inches in diameter and 2 feet long, called the air chamber. A rubber discharge hose about 8 feet long and 1 inch in diameter is connected with the discharge pipe. Connected with this discharge hose is a section of small iron pipe in which is inserted a stopcock. Screwed into this stopcock section of pipe is a longer piece of iron pipe of the same diameter known as the spraying rod. On the end of the spraying rod is a spraying nozzle or cap. This nozzle is in two pieces, which screw into each other by complementary threads. The spray nozzle is solid except for some fine holes through which the liquid must pass and which produces the spray. On top of the air chamber is a gauge with a dial which registers the amount of air pressure on the liquid. The liquid rising in the chamber compresses the air therein and produces an air cushion, which exerts a pressure against the liquid in the discharge tube and causes it to be expelled with a considerable degree of force, depending on the amount of compression in the chamber, and also serving to keep up a regular flow. In operating the machine it was customary to keep pumping until the dial on the gauge showed about 80 pounds' pressure in the chamber and then stop until the pressure began to fall and then to pump again. In operating this machine, hard substances not soluble would accumulate in the small holes in the spray nozzle and stop them up so that the flow of the liquid would be stopped. In correcting this condition the stopcock was turned so as to shut off the pressure in the spraying rod, the nozzle in which

the fine holes are situated was unscrewed and the dirt cleaned out, or the stopcock was opened so the pressure behind would force the dirt out.   Then the stopcock would be closed again, the pressure in the rod shut off, the cap replaced and the machine would again be ready for work.

Plaintiff did the spraying and the other laborer pumped the machine.   In the course of this work the spray became clogged.  The superintendent removed the clog by first closing the stopcock, then taking off the cap from the end of the spray pipe and then opening the stopcock again, and when this was done the accumulated material in the pipes blew out.   The superintendent then replaced the cap and, after testing the machine to see that it worked all right, went away. This happened more than once on the day of the accident.  At one time the whitewash came out with a great deal of force and sprinkled the superintendent's face and clothes.   It was then found that the small hose was split at the place where the spray nozzle fitted over the spray pipe.  Plaintiff then, by direction of the superintendent, carried the machine over to the repair shop where a repair man cut off the end of the hose where it was split, put it back over the end of the pipe and clamped it on again; plaintiff then took the machine back to the fence and began working again and the machine worked all right for 10 or 15 minutes thereafter.   The manner of the occurrence of the accident is about as follows:

After making the repairs above mentioned and within 15 minutes following its renewed operation the spray stopped working; plaintiff then undertook to remedy the difficulty himself.  He proceeded to close the stopcock, took off the spray cap and opened the cock again, but nothing came out.   The plaintiff then waited for the superintendent to come; the superintendent passed near where plaintiff worked on his way from the office to the quarry, but he did not stop.

Plaintiff then tried to unscrew the spray pipe at the connection in front of the stopcock but could not separate the parts at that place; he then unscrewed the spray from the rubber hose. While unscrewing the pipe from the hose plaintiff was kneeling down with one hand on the hose and one on the pipe, and just as he got the hose unscrewed from the pipe the whitewash from the hose flew into his face and entered his eye in a large quantity and became impacted under his eyelid and remained there for more than an hour. The accident, we judge from the proof, undoubtedly happened through plaintiff's unscrewing the nozzle to remove the clog without first closing the stopcock. Plaintiff had the end of the pipe pointed towards his face as he was unscrewing the cap, which caused the contents of the pipe to shoot into his eye from the pressure in the machine. The whitewash remained in his eye some considerable time before it was removed and resulted in so destroying the corneal tissues that the sight of the eye was destroyed.

The declaration consisted of three counts, the first two of which charged that plaintiff was inexperienced and unfamiliar with the dangers and perils in operating the whitewashing machine and that defendant failed to give plaintiff warning of the danger and perils in manipulating it, disconnecting it and separating it into its component parts, which dangers were known to the defendant. The third count charged that defendant was negligent in furnishing plaintiff with a defective and unsafe machine. Upon the trial the third count was amended by inserting a charge of negligence in that defendant failed to give plaintiff any warning "of the dangerous nature of the substance used therein," referring to the whitewash in the machine. Defendant pleaded the general issue and also the plea of the statute of limitations to the first count as amended, to which latter plea plaintiff demurred, which demurrer was sustained.

Defendant urges for reversal that there was no proof of actionable negligence and that its motion for a directed verdict should have been given; error in sustaining the demurrer to a plea of the statute of limitations and in the court's rulings upon the evidence and in its instructions to the jury.

There is no evidence that the whitewashing machine or any of the appliances connected therewith were defective or out of repair at the time of the accident, or that the accident resulted from any defect in the machine or its appliances. The liability, therefore, of defendant must be restricted to the negligence charged in the amendment to the first count, which is the failure of defendant to instruct plaintiff that the material used in the machine was whitewash and that it would cause injury if he got it into his eyes.

In the first place, defendant could hardly be held to be negligent in not informing plaintiff of the ingredients of whitewash or in not anticipating that plaintiff would get any of it into his eye in the large quantity in which it did get there, and that it would be allowed to remain in his eye long enough to destroy its sight.

It is argued that the ingredients of whitewash are of common knowledge and likewise of common usage among the class of people to which plaintiff belongs, as an agency of cleanliness and decoration; that plaintiff was in fact familiar with whitewash by having come into actual contact with it; that for more than a year previous to the accident he had pumped for the same machine in whitewashing the same fence; that he had observed that the nozzle or spraying portion of the machine would become clogged by particles becoming solidified in the spray; that he had observed the manner of dealing with such stoppage, as he had been an eyewitness to the superintendent's manner of so doing. Two witnesses, Bales, the superintendent, and one Binks, vice president of the company who manufactured the machine, both testified that they had had

whitewash or lime in their eyes and that it did not hurt or burn or destroy the sight. Bales said it didn't hurt him and Binks said that "it irritates your eye a little bit."

No duty was imposed by law on defendant to warn plaintiff against the unexpected. It could not anticipate that plaintiff would squirt the whitewash into his eye. An accident of this nature was an extraordinary occurrence. How could defendant have anticipated such an extraordinary occurrence as that plaintiff would squirt his eye full of the whitewash and allow it to stay in his eye for more than an hour with the resulting destruction of its sight? In *Pinkley v. Chicago & E. I. R. Co.*, 246 Ill. 370 [1 N. C. C. A. 480], it was held that if a servant knows that the handling of timbers treated with a coal-tar preparation containing creosote will produce a burning of the skin sufficient to cause it to peel off, the master owes him no duty to warn him of such danger, and the fact that the servant becomes permanently poisoned as a result of handling such timbers does not render the master liable unless he knew or by the exercise of ordinary care could have known that such a consequence might result, and failed to warn the servant. The master is not an insurer of the safety of his servant and he can only be held liable for consequences which he may reasonably be expected to anticipate as a result of his conduct.

In 2 Parsons on Contracts (1st Ed.) 456, it is stated as a legal proposition that "every defendant shall be held liable for all of those consequences which might have been foreseen and expected as the result of his conduct, but not for those which he could not have foreseen and was therefore under no moral obligation to take into consideration."

Defendant was under no legal obligation to anticipate the occurrence of plaintiff's squirting the whitewash into his eye in the manner in which he did. It was not bound to anticipate that such an unusual inci-

dent might occur, for all the proofs show to the contrary, plaintiff's injury being the first of such a nature that was ever known to arise from the cause alleged in the amended third count of his declaration.

Whether plaintiff comes within the Workmen's Compensation Act we do not decide, nor are we prepared to say that the amendment of the first count of the declaration does not state a new cause of action so as to make the plea of the statute of limitations a good plea in bar, or that the action of the court in sustaining the demurrer thereto was erroneous, as, in view of what we have already said, a decision of these questions is not necessary to a disposition of the appeal.

The trial court should have instructed a verdict for the defendant as asked, and for its failure to do so the judgment of the Circuit Court is reversed with a finding of fact.

*Reversed with finding of fact.*

Finding of fact.  The court finds as an ultimate fact that the defendant is not guilty of the negligence charged against it in plaintiff's declaration or in any count thereof.