## HOUSTON & TEXAS CENTRAL RAILWAY COMPANY V. MAMIE E. RUTLAND ET AL.

### Decided March 26, 1907.

**1.—Risk Unknown to Servant—Duty of Master.**

While, as a general rule, it is not the duty of the employer to warn the employe of the dangers of his employment unless information be asked by the employe, still when the employe is inexperienced and ignorant of the dangers incident to the service upon which he is entering it is the duty of the employer to inform and warn him of the same.

**2.—Same—Question for Jury.**

Where the danger is secret or abnormal and extraordinary and of such a kind that the servant can not be held chargeable with an adequate comprehension of its nature and extent, or of the proper means by which to safeguard himself, the master is prima facie bound to instruct the servant concerning the same. The presumption is that risks of this kind are not known to the servant, and the question as to the duty of the master is always for the jury.

**3.—Same—Same.**

In a suit by the widow and children of a railroad employe who was asphyxiated by the gases from the paint with which he was painting the inside of a water tank of a locomotive, evidence considered, and held sufficient to support a finding by the jury that the employer was negligent in failing to instruct said employe as to the dangers of such employment.

**4.—Dangers—Assumed Risk—Knowledge of Master.**

A master is not liable for injuries from dangers of the existence of which he neither knew nor by the exercise of ordinary care could have known.

**5.—Requested Charge—Ignoring Issue.**

A requested instruction which ignores an important issue in the case is properly refused.

**6.—Cause of Death—Expert Testimony.**

The testimony of a physician as to the cause of death when based partly on his own knowledge of the facts and partly on undisputed evidence, is properly admitted.

**7.—Death—Measure of Damage.**

In a suit by the widow and minor children for the death of the husband and father a charge to the effect that the jury should allow only for loss of pecuniary benefits, and that by pecuniary benefits was meant not only money but everything that could be valued in money, and in the case of the minor children included the reasonable pecuniary value of the nurture, care and education they would have received from their deceased parent, during their minority, had he lived, and that nothing should be allowed for grief or sorrow or for loss of the society, affection or companionship of the deceased, was correct on the measure of damages.

**8.—Excessive Verdict.**

A verdict for $10,000 for the death of a husband and father, thirty-seven years of age, earning from $48 to $50 per month without prospect of larger wages, held excessive, and a remittitur of $2,500 required.

**9.—Excessive Verdict.**

While a verdict for $10,000, under the facts stated in the foregoing paragraph, is exceedingly liberal, still in the absence of evidence, other than the amount of the verdict itself, that the jury was actuated by passion or prejudice, the verdict should not be disturbed by an Appellate Court.

Appeal from the District Court of Harris County. Tried below before Hon. Chas. E. Ashe.

*Baker, Botts, Parker & Garwood* and *Lane, Jackson, Higgins & Wolters*, for appellant.—In order to sustain a verdict, it is necessary for the evidence to show actionable negligence on the part of defendant in the particular alleged and relied upon, and that such negligence was the proximate cause of the injury and death. Texas & P. Ry. Co. v. Bigham, 38 S. W. Rep., 163; Seale v. Gulf, C. & S. F. Ry. Co., 65 Texas, 279; Texas & P. Ry. Co. v. Reed, 88 Texas, 448; 16 Am. and Eng. Ency. of Law, pp. 436 et seq. (1st ed.).

In order to create the occasion for defendant to warn or admonish deceased of danger in his line of service, it was necessary that the employer should have been ignorant and inexperienced in relation to the duties and dangers of the work he was engaged to perform. Missouri P. Ry. Co. v. Calbreath, 66 Texas, 528; Missouri P. Ry. Co. v. Watts, 63 Texas, 552; Watson v. Houston & T. C. Ry. Co., 58 Texas, 439; Bailey on Master's Liability for Injury to Servants, 158 et seq.

An employe who enters the service of an employer to perform a given line of work, is presumed to undertake such work according to the usual and established methods and means of the employer, and to so understand; and in the event of injury received, as a result of performing work according to such methods and means, he will be held in law to have assumed the risk and danger of such injury, as an incident to his contract of service, and can not recover therefor. Missouri P. Ry. Co. v. Watts, 63 Texas, 552; Watson v. Houston & T. C. Ry. Co., 58 Texas, 438; Missouri P. Ry. Co. v. Calbreath, 66 Texas, 528; Missouri P. Ry. Co. v. Somers, 71 Texas, 702; Green v. Cross, 79 Texas, 131; Texas & P. Ry. Co. v. French, 86 Texas, 98; Texas & P. Ry. Co. v. Bradford, 66 Texas, 736; Galveston, H. & S. A. Ry. Co. v. Lempe, 59 Texas, 22; Gulf, C. & S. F. Ry. Co. v. Williams, 72 Texas, 164; Bailey on Master's Liability for Injury to Servants, pp. 158 et seq.

A person of ordinary intelligence, who voluntarily enters and remains in a place of danger, and under circumstanes and conditions which by his own senses and according to the laws of nature he knows, or by the use of ordinary care would know, are disagreeable and dangerous, and he thereby encounters injurious or fatal results, is to be deemed guilty of contributory negligence. Houston & T. C. Ry. Co. v. Conrad, 62 Texas, 628; Crawford v. Houston & T. C. R. R. Co., 33 S. W. Rep., 534.

The correct measure of damages for injury resulting in death is the actual pecuniary injury which resulted to the beneficiaries from the act complained of, based on the evidence as to the value of the pecuniary aid which the plaintiffs would have derived from the deceased but for the injury and death; and a charge which defines pecuniary benefits as "not only money, but everything that can be valued in money," is in-

acĉurate and misleading, and tends to prejudice the defendant, in that it permits the jury, without guidance, and according to their own standard and discretion, to estimate money values of everything, and thus permits speculative and fanciful damages. Rev. Civil Stats., art. 3027; Houston & T. C. Ry. Co. v. Cowser, 57 Texas, 293; International & G. N. Ry. Co. v. Kindred, 57 Texas, 491; Galveston, H. & S. A. Ry. Co. v. Worthy, 29 S. W. Rep., 376; Cotton Press Co. v. Bradley, 52 Texas, 587.

A verdict in a case of injury resulting in death for a sum greater than the actual pecuniary injury resulting from the act complained of, according to the evidence of pecuniary aid which the plaintiffs would probably have derived from deceased, is deemed in law excessive, and will not be permitted to stand. Rev. Stats., art. 3027; Cotton Press Co. v. Bradley, 52 Texas, 587; Houston & T. C. Ry. Co. v. Cowser, 57 Texas, 293.; International & G. N. Ry. Co. v. Kindred, 57 Texas, 491.

*Lovejoy & Parker,* for appellees.—The facts were sufficient to show that appellant knew, or by the exercise of ordinary care would have known, of the danger of a person engaged in painting the inside surface of a tank becoming asphyxiated from inhaling the gases given off by the paint; of Rutland's inexperience in such work and ignorance of the danger, and that it was the duty of appellant to warn him thereof, which it wholly failed to do. Missouri Pac. Ry. v. Calbreath, 66 Texas, 530; Wood on Master and Servant, 714; Wharton on Negligence, sec. 206; Labatt on Master and Servant, sec. 240, p. 537; sec. 241, p. 548; 20 Am. and Eng. Ency. of Law (2d ed.), 95, 97; Mather v. Rillston, 156 U. S., 391.

REESE, Associate Justice.—Mamie E. Rutland, widow of Valerius Rutland, deceased, brings this suit in her own right and as next friend of the three minor children of herself and deceased, against the Houston & Texas Central Railroad Company to recover damages on account of the death of the said Valerius Rutland alleged to have been occasioned by the negligence of defendant. Deceased is alleged to have lost his life by asphyxiation caused by the inhaling of the gases escaping from the paint with which he was painting the inside of the water tank of a locomotive. Several grounds of negligence are set up in the petition, but upon the trial plaintiff abandoned all of them except the alleged negligence of defendant in failing to warn deceased of the danger of losing his life through asphyxiation by inhaling the gases which would escape from the paint in a close place, such as the inside of the tank. This was the only issue of negligence submitted to the jury.

Defendant in addition to a general demurrer and general denial, alleged in defense of the action that the deceased Rutland was an experienced man and knew the danger connected with the work which he was ordered to do, if there was any danger, and was guilty of contributory negligence in going into the tank and remaining without coming out at certain intervals for fresh air. Defendant also, with appropriate allegations, pleaded assumed risk on the part of deceased.

. Upon trial with a jury there was a verdict for plaintiff for $10,000 apportioned as follows: $5,500 to the widow and $1,500 each for the three minor children. .From the judgment defendant appeals.

The facts are substantially as follows: Valerius Rutland, husband of Mamie E. Rutland and father of the minor plaintiffs, was in the employ of appellant in the capacity of boilermaker's helper, in which work he had been engaged about nine months at the time of his death. It was a part of the duties of such employe, as occasion required, to go inside of the water tank attached to a locomotive and paint the inside surface or such parts thereof as needed painting. When such tank needed repairs the custom was to run it into the roundhouse and jack it up off the wheels before doing the repairs, in the way of riveting, etc. After the repair work was done it was customary for the boilermaker's helper to go into the tank through the manhole and paint the seams along the rivets and other parts of the tank to keep it from leaking. The water tank is made of sheet iron riveted together and is about eighteen feet long, eight feet wide and four and a half to five feet deep. About two-thirds of the distance from the rear of the tender to the front part next to the locomotive the tank changes its shape, forming two legs, each about two and a half feet wide, between which is the space for coal or an oil tank. There is a manhole for the purpose of entering the tank, about eighteen inches in diameter, near the rear end, and on top of the tank, and two small openings in the front end, closed by valves, for the purpose of letting water into the locomotive. With the exception of these openings and another small one in the side the tank is designed to be air-tight. The tank was furnished with what are denominated splash-sheets, consisting of pieces of sheet iron attached to the inside so as to steady the water and keep it from splashing during the operation of the locomotive. They are so arranged that a person entering and passing into different parts of the tank, have to pass over or under them thus obstructing his movements. The paint used was of such a character that when laid on it gave out a certain kind of gas, which, if inhaled in sufficient quantities, would produce dizziness, drowsiness, and if access was not had to fresh air, gradual asphyxiation and death. It was necessary for persons using this paint on the inside of one of these tanks to come out for fresh air every ten or fifteen minutes. The first effects of inhalation was a stinging sensation of the membrane of the nose and of the eyes, which gave to a person experienced in the use of the paint in a confined place, warning that it was necessary to get outside for fresh air.

Although Rutland had been in the employ of appellant for about nine months as boilermaker's helper the evidence did not show whether he ever had or had not before been called upon to paint the inside of a tank. It simply shows that it was one of the duties of an employe in his position to do so, and that there was frequent occasion to do such work.

In the afternoon of December 14, 1903, Rutland was ordered by his immediate superior, O'Reilly, to get some paint and go inside of the tank and do some painting. The foreman testifies that he told him to paint four butt straps only, which would take about a half pint of paint, but although this evidence is not directly contradicted, and in the nature of things could not be, there are circumstances tending to show that he had painted much more than this. The testimony is undisputed that when found in the tank he had a bucket containing half a gallon of

paint, and there is evidence that he had done more painting than the four butt straps.

Nothing more was seen of Rutland after he went into the tank until the next morning when search was made and he was found in the tank, alive but unconscious, and he lived about three hours after he was taken from the tank. The evidence leaves no doubt that his death was caused by inhaling the fumes of the gas given out by the paint. The paint used was the same kind that had been in use for this purpose for about twenty years and this was the first casualty shown to have resulted therefrom. Deceased was a man of thirty-seven years of age, in good health and his wages were $48 to $50 per month.

The first assignment of error assails the verdict of the jury and the action of the trial court in overruling appellant's motion for a new trial on the general ground that there was no proof of negligence on the part of defendant company in failing to provide safeguards against occurrances, such as that complained of, by warning or otherwise. It is urged in support of the assignment that the evidence totally fails to show either of the following contentions:

(1) That the defendant, as an ordinarily prudent person, might reasonably have foreseen such result as the death of Rutland as likely to occur under the circumstances shown.

(2) That he was ignorant and inexperienced in relation to the line of work which he undertook to perform as boilermaker's helper, the uncontradicted evidence showing, on the contrary, that he was a man of ordinary capacity in this relation, and that he remained in this position for a period of nine months prior to his death, performing the ordinary duties of the position which included the painting of tanks, with the same character of paint and under the same circumstances and conditions as on the occasion of his injury.

(3) That the defendant had knowledge of his inexperience and ignorance in relation to the dangers of painting the tank, the evidence showing, on the contrary, that defendant had no reason to suspect that he was so inexperienced.

The care which a man of ordinary intelligence in possession of his faculties will ordinarily take to protect his life from serious danger, would indicate, when considered in connection with the circumstances under which Rutland came to his death, that he was unaware of the peculiar dangers attending the work he was ordered to perform. That there was danger of the gravest kind attending this work can hardly be questioned. The evidence tends to show, it is true, that the stinging sensation in the eyes could be relied upon to give ample warning to a man of ordinary intelligence in time to allow him to get out of the tank to get fresh air. This seems to have been sufficient to have prevented any serious results to persons performing this work previous to this accident, but it is by no means clear that this stinging sensation would warn any one of the extreme danger to life of remaining in the tank, in time for him to avoid such results by coming out. The testimony tends to show that Rutland was engaged in painting at such a place in the tank that his way to the manhole was obstructed by the splash-sheets, and that he was overcome while crawling under one of these splash-sheets to get to the manhole.

It is hardly conceivable that Rutland had the premonitory warning spoken of, and understood its significance, and still failed to give any heed thereto. The effect of inhaling the fumes from the paint was to produce dizziness and gradual unconsciousness. This influence was subtle and at first barely perceptible. Taking all of the circumstances together, they authorize the conclusion that, in fact, Rutland did not know the danger attending the work upon which he was engaged, and that he had not had any former experience in this particular work. It is true that it was a work incidental to his duties in the position he occupied, but it does not follow therefrom that he had at any time been called upon to perform this kind of work, in the absence of any evidence that he had been. There were many other employes whose duty it was also to paint water tanks, and, unrebutted by any evidence showing the contrary, the very manner in which Rutland came to his death tends to show his ignorance of the danger.

The foreman, O'Reilly, knew the danger, as he testifies, and he had not instructed or warned Rutland. Was it his duty to do so? Appellant's contention is that it was not, unless he either knew or as a man of ordinary prudence must have known, that Rutland did not also know the danger, and that there is no evidence which tends to show either.

In the case of Missouri Pac. Ry. Co. v. Callbreath (66 Texas, 526), cited by appellant, it is said by our Supreme Court: "As a general rule it is not the duty of the employer to instruct him (the employe) as to the rules of the service or warn him of the dangers incident thereto, unless information be asked (Missouri Pac. Ry. Co. v. Watts, 64 Texas, 568), but," the court proceeds to say, "this rule is subject to some qualifications. It was held by this court, in the case last cited, that the servant being inexperienced and ignorant of the dangers of the service upon which he was just entering, it was the duty of the company to have informed him of the dangers. The law is thus stated by a well known text writer, 'when there are hazards incident to an occupation which the master knows or ought to know, it is his duty to warn the servant of them fully, and failing to do so he is liable to him for any injury that he may sustain in consequence of such neglect, *and this rule applies where the danger or hazard is patent,* if through youth, inexperience or other cause, the servant is incompetent to fully understand the nature and extent of the hazard.' Wood on Master and Servant, 714." It was in that case held that it was the master's duty to warn the employe, a brakeman of long experience in coupling cars, of the peculiar danger of coupling the car in question, on account of a patented device not in general use, without any question as to whether the master knew, in fact, that the brakeman was ignorant. On account of the infrequency of the use of this particular device, the master could not assume that the brakeman knew of the danger, and in the present case, by the same rule, on account of the secret and subtle character of the danger, certainly not as much open to common observation as was the danger from the peculiar construction of the car in the Callbreath case, the foreman could not assume that Rutland knew the danger attending the work of going into the tank to paint the inside surface.

We think that the correct rule applicable to cases where the danger

is secret and extraordinary, as in the present case, is thus stated in appellees' brief quoting from Labatt on Master and Servant:

"The doctrine which may be regarded as representing the converse of the propositions, discussed in the preceding sections, is that a master is *prima facie* bound to instruct a servant as to all risks which are abnormal or extraordinary, and at the same time of such a kind that the servant can not be held chargeable with an adequate comprehension of their nature and extent, or of the proper means by which to safeguard himself. The presumption is, that all risks which belong to this category are not known to the servant. Hence, the question whether the servant should have been warned is always for the jury, where the evidence is fairly susceptible of the construction that the peril to which his injury was due was one of this description, and there is no positive evidence tending to charge him with actual or constructive knowledge of that peril." (Labatt Master and Servant, sec. 240-1; Bailey Master and Servant, 111 et seq., 124-5; Mather v. Rillston, 156 U. S., 399; Dowling v. Allen, 74 Mo., 13; Perry v. Marsh, 25 Ala., 659; Smith v. Peninsular Car Works, 27 N. W. Rep., 662; Fox v. Peninsular Lead Works, 48 N. W. Rep., 203; McGowan v. La Plata, etc., Works, 9 Fed. Rep., 861; Kliegel v. Aitken, 35 L. R. A., 251; Western U. Tel. Co. v. McMullen, 32 L. R. A., 353.) Applying this rule to the facts of the present case, we think that the evidence was sufficient to authorize the jury to find that appellant was negligent in failing to instruct Rutland as to the danger in the work which he was ordered to perform.

What we have said disposes also of the second assignment of error. The foreman, O'Reilly, testified that he actually knew the danger, and the evidence tends to show that such danger was not open and patent to Rutland.

By the third assignment of error appellant presents the proposition that according to the undisputed evidence Rutland was guilty of contributory negligence "in that he voluntarily entered and remained in a place of danger, and under circumstances and conditions which, by his own senses and according to the laws of nature, he knew, or by the exercise of ordinary care must have known, were disagreeable and dangerous, and thus, but his own negligence, he directly contributed to the fatal result."

The evidence showed that there was no danger in going into the tank to paint the inside if one came out every ten or fifteen minutes for fresh air, but we can not say that this necessity for coming out at such short intervals was known to Rutland or was so open and patent to common observation as that a failure to take such precaution by him was, as matter of law, contributory negligence on his part. It may be that when it became apparent to his senses that there was danger in remaining longer, he tried to get out, but was disabled by the increasing effect of the inhalation of the fumes. This could have been avoided by a timely warning of the peculiar character of the danger and of the necessity of obeying the first premonition thereof.

What we have said in disposing of the first assignment of error disposes of the fourth assignment, which complains of the refusal of the court to give a requested instruction to find for defendant.

The objections to the charge of the court on assumed risk, as set out

in the fifth assignment of error, can not be sustained. Appellant complains that the charge assumes that the employer knew of the danger attending the work. It could not have been so understood by the jury in view of the general charge of the court which states and repeats in the most positive terms, as a condition of recovery by plaintiff, that the defendant must have known of the danger, or would have known of it by the exercise of ordinary care. This is a prominent feature of the charge quoted in appellant's sixth assignment of error. It was not error to charge that it became the duty of the master to warn the servant under the circumstances stated in the charge. To fail to do so, would, as matter of law, be negligence.

The charge of the court objected to in the sixth assignment presents the issues upon which appellees were entitled to recover fully and in a manner as favorable to appellant as the law and the facts warranted. The evidence, as we have shown, required the submission of the issues presented. The criticism of the charge that it repeats any issue involving liability in such a manner as to give it undue emphasis and tend to indicate the judge's view of a particular feature of the evidence, is not sound. The charge after setting out fully and without unnecessary repetition every condition upon which appellees would be entitled to recover, concludes, "but unless you find the affirmation of each and every fact submitted in this paragraph of the charge, you will let your verdict be in favor of the defendant."

The seventh assignment of error complains of the refusal of a special charge requested by appellant, in substance, to find for defendant if the jury finds that it was a part of the duties of Rutland as boilermaker's helper to do the work in which he lost his life, and further, that the manner in which he was directed to perform the work, and the circumstances under which he was directed to perform it, were the same manner and circumstances under which the work was usually and ordinarily performed. This charge ignored the real issue of the negligence of the appellant in failing to instruct Rutland, and it was not error to refuse it.

The eighth assignment of error presents the question of the refusal of a charge requested by appellant upon the issue as to whether the foreman, O'Reilly, could as a man of ordinary prudence, have anticipated that any injury would have resulted to Rutland in the performance of the work. We think this issue was fully presented by the court's charge. It was presented in an affirmative form in the third paragraph and in a negative form in the fourth paragraph of the general charge. It was not necessary to go further.

There was no error in admitting the testimony of the physician, H. A. Wood, of his opinion as to the cause of the death of Rutland. This opinion was based in part upon his own observation and in part upon statements as to the circumstances under which Rutland met his death, which are shown by the undisputed evidence to have been true. He was called to see deceased as soon as he was taken out of the tank and before he was dead. He testified that from these facts, in his opinion, the man died from the effects of inhaling the fumes of the paint, a fact which the evidence establishes almost beyond doubt.

Upon the measure of damages the court instructed the jury to allow

only for loss of pecuniary benefits and that "by pecuniary benefits is meant not only money, but everything that can be valued in money, and in the case of minor children includes the reasonable pecuniary value of nurture, care, and education they would have received from their deceased parent, during their minority, had he lived." The jury was further instructed not to allow plaintiffs anything for grief or sorrow on account of the death of deceased, or for loss of his society, affection or companionship. There was no error in the charge (International & G. N. Ry. Co. v. McVey, 87 S. W. Rep., 329.)

Appellant complains of the verdict as excessive. There was nothing to be considered by the jury except the pecuniary loss to appellees by reason of the death of the husband and father. The deceased was, at the time of his death, thirty-seven years of age. He was employed as boilermaker's helper, at wages of $48 to $50 per month. There was no evidence as to any prospect of advancement to a higher grade of employment whereby he might be able to earn larger wages. The amount of the verdict, $10,000, if placed at legal interest would afford an annual income equal to the amount of his annual wages, during the time he might be expected to live, and leave the capital intact at his death. It could not be supposed that his wife and children would receive the benefit of the entire amount of his earnings, without allowing for his own support. Some value must be placed on other pecuniary benefits which appellees might have received had deceased lived, and which can be valued in money, but taking that also into consideration, we are of the opinion that the jury must have estimated the value of the life of deceased upon other considerations than those to which they were limited by the charge of the court. To a very large extent the damages were susceptible of an approximately accurate calculation based upon his life expectancy, and the amount of his annual earnings, the only amount not susceptible of such calculation being the value of the nurture, care and education the children may have received from the father, and also such care as the wife may have received in addition to the amount of his earnings, but while these were largely in the discretion of the jury, we think they have been overestimated in the verdict.

We find no other reversible error in the record, but appellees will be required to enter in ten days a remittitur of $2,500 to be apportioned, $1,500 to the amount awarded the widow and $1,000 to that awarded the three children, in which case the judgment will be affirmed at the costs of appellees, otherwise the judgment will be reversed and the cause remanded.

*Remittitur ordered and judgment affirmed.*

Writ of error refused.

### ON MOTION OF APPELLEES FOR REHEARING.

Appellees in this case recovered judgment for $10,000. In passing upon appellant's appeal we held that the amount was excessive and required appellees to remit $2,500 of the amount as a condition for affirmance. Upon this motion on the part of appellees to reconsider that part of our judgment, they have submitted argument and authorities

upon consideration of which we have concluded that we were in error in requiring such remittitur.

We still think that the amount of the damages awarded appellees is exceedingly liberal, and greater than we would have awarded, but not so excessive as to authorize the conclusion that the jury was actuated by prejudice or passion or any other motive than the desire to allow appellees what, from the evidence, they honestly concluded was the pecuniary loss sustained by them in the death of the husband and father. (Missouri Pac. Ry. v. Lehmberg, 75 Texas, 67.)

So much of our opinion as refers to this point is withdrawn. Appellees' motion is granted, and so much of the judgment as requires the remittitur is set aside and the judgment is affirmed for the entire amount.

*Motion granted and judgment affirmed.*

### ON MOTION FOR REHEARING BY APPELLANT.

Appellant objects to the statement in the opinion affirming the judgment of the trial court, that O'Reilly, its foreman, knew of the danger in remaining in the tank, while painting its interior surface, and that he had so testified. The evidence shows clearly that it was necessary for any one to come out of the tank for fresh air every fifteen minutes, or at least at very short intervals, and that it was dangerous not to do so. O'Reilly testified (we give questions and answers):

"Q. You say you know gases generated by this paint when spread on would hurt the eyes; I'll ask you if you didn't also know the men couldn't stay in there long, but would have to come out for fresh air?

"A. He would know that himself.

"Q. I am not asking you that; I am asking you if you didn't know it?

"A. Yes.

"Q. Your experience and observation taught you that?

"A. Yes."

We think that it is a fair inference from this testimony that O'Reilly knew that it would be dangerous for any one painting the inside of the tank to remain in the tank without coming out for fresh air every few minutes. The motion is overruled.

*Motion overruled.*