PECOS & N. T. RY. CO. v. COLLINS.
(No. 708.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 23, 1915. On Motion for Rehearing, Feb. 13, 1915.)

1. MASTER AND SERVANT ⊂⊃150—INJURIES TO SERVANT—MASTER'S DUTY TO WARN.
An employer is not required to instruct an employé as to the rules of the service or warn him of 'the danger, unless the servant seeks information, or the risk is out of the ordinary.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 297, 299–302, 305–307; Dec. Dig. ⊂⊃150.]

2. MASTER AND SERVANT ⊂⊃153—INJURIES TO SERVANT—DUTY TO WARN—INEXPERIENCED SERVANT.
Where the servant is inexperienced and ignorant of the dangers of the service, it is the duty of the master to warn him.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 314–317; Dec. Dig. ⊂⊃153.]

3. MASTER AND SERVANT ⊂⊃206—INJURIES TO SERVANT—ASSUMPTION OF RISK.
A section foreman, whose hands were injured by handling creosoted ties, assumed the risk of such injury, if the ties were in the usual condition, and if the injuries from handling them were ordinarily incident thereto.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 550; Dec. Dig. ⊂⊃206.]

4. MASTER AND SERVANT ⊂⊃226—INJURIES TO SERVANT—ASSUMPTION OF RISK—STATUTE.
The risk of the ordinary dangers of the employment assumed by the servant are distinct from the risk incurred from the negligence of the master, the rule concerning which was modified by Rev. St. 1911, art. 6645.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 659–667; Dec. Dig. ⊂⊃ 226.]

5. MASTER AND SERVANT ⊂⊃278—INJURIES TO SERVANT—SUFFICIENCY OF EVIDENCE—NEGLIGENCE OF MASTER.
In an action for injuries to a section foreman resulting from handling creosoted ties, evidence held to warrant the jury in finding that the condition of the ties was unusual, that the master knew the danger from handling them in that condition, and that the servant did not, so that the master was negligent in not warning the servant of the danger resulting from handling the ties.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ⊂⊃278.]

6. MASTER AND SERVANT ⊂⊃97—INJURIES TO SERVANT—LIABILITY OF MASTER—IMPROBABLE INJURY.
Though a railroad is liable to a section foreman for injuries to his hands resulting from his handling of creosoted ties, it is not liable for systemic and constitutional effects resulting from such injuries, where it was uncontradicted that no similar case had ever been known before, since such condition was not the probable or natural consequence of the railroad's negligence.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 163; Dec. Dig. ⊂⊃97.]

7. MASTER AND SERVANT ⊂⊃85—INJURIES TO SERVANT—LIABILITY OF MASTER —ABNORMAL DANGER.
An employer is not liable to the servant for injuries caused by abnormally dangerous conditions, unless they were known to him or could have been known by the exercise of reasonable care.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 136, 139, 140; Dec. Dig. ⊂⊃85.]

8. MASTER AND SERVANT ⊂⊃97—INJURIES TO SERVANT—LIABILITY OF MASTER—EXTENT—RESULT OF DISEASE.
While a master is liable for disease caused by an injury which he might anticipate could or would result in such disease, he cannot be held liable for the effects of such disease where it could not have been reasonably or probably anticipated.
[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 163; Dec. Dig. ⊂⊃97.]

---

⊂⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

On Motion for Rehearing.

9. MASTER AND SERVANT &⇒297—INJURIES TO SERVANT—QUESTIONS FOR JURY—EVIDENCE.

In an action for injuries to a servant, the jury cannot conjecture as to what might have ensued from the injuries, but their verdict must be based upon evidence that shows a reasonable probability that the injuries would produce a given effect.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1195–1198; Dec. Dig. &⇒297.]

Appeal from District Court, Parmer County; D. B. Hill, Judge.

Action by Robert Collins against the Pecos & Northern Texas Railway Company. Judgment for the plaintiff, and defendant appeals. Reversed and remanded, and motion for rehearing overruled.

Terry, Cavin & Mills, of Galveston, Madden, Trulove & Kimbrough, of Amarillo, Carl Gilliland, of Hereford, and Sam G. Bratton, of Farwell, for appellant. J. M. Jones and L. C. Barrett, both of Amarillo, for appellee.

HUFF, C. J. This is an appeal from a judgment against the appellant, the Pecos & Northern Texas Railway Company, for $5,000, in favor of appellee, Robert Collins. The cause of action alleged and submitted to the jury is in effect:

That appellee was in the employ of appellant, as section foreman, on the 27th day of May, 1912. That appellant shipped, on its line of road in Texas, ties which were to be used by appellee and men under his charge in repairing the road. That before shipping the ties they had been immersed in the chemical solution known and called creosote. That he did not know the full nature thereof or the process by which the ties had been treated, but appellant knew that the ties, when shipped and received, were thoroughly saturated with the solution, and that appellee and his men handled and unloaded them in the usual way, using their hands to lift and handle them as they had theretofore done. "That said ties had been recently treated when he handled same, and they were not dry but wet with said solution, which so injured plaintiff, that he did not know that it was dangerous to handle the said ties under the conditions in their then condition, but defendant did know this fact, and in the exercise of ordinary care would have known the same, and negligently failed to warn the plaintiff of such danger, which was the proximate cause of said injury." (The above quotation was set up by trial amendment.) That appellee had not handled ties, so treated, on the road, and before that time he had never worked with such ties and knew nothing of the proper method of handling them. That in so handling the ties the solution came in contact with his hands and arms and poisoned them. That the ties were poisoned with the solution and was transmitted to his hands and arms. "That said ties in their then condition (that is, while plaintiff and said men were handling them) were poisonous and dangerous to the health and life of plaintiff, and as a proximate result of the unloading of said ties and handling same, as aforesaid, plaintiff was poisoned, and his hands and arms were thereby caused to swell and made feverish, and the poison through the same was introduced into the system and body of the plaintiff and made him so sick and lame that for a long time he was unable to walk; then he walked on crutches; and he is still sick from said poison, and his hands and arms are more or less swollen and feverish and at times are paralyzed. That since said poisoning the plaintiff, as aforesaid, has been constipated, has had headache all the time, has had dizzy and numb spells, and is unable to walk or take care of himself part of the time, and that said poison has injured his back and kidneys, his intestines and internal organs to such an extent that he has suffered great pain of both body and mind therefrom, and will continue to suffer and be in such condition in the future to the end of his life, and he is permanently injured. That his nervous system, by reason thereof, is broken down to such an extent that he cannot see, eat, or sleep as he could before such injury."

He alleged that he was a strong, robust man for his age previous to the injury, etc., setting out his earning capacity, and life expectancy, which is alleged were destroyed; that said poisoning was the proximate result of the negligence of appellant in that appellant knew or should have known that the poison in the ties was dangerous to health and life, and knew the ties would be handled as it was alleged they were handled; that it was the duty of appellant to furnish appliances, such as tongs or other appliances, with which to handle the ties, which duty appellant failed to perform, and which was negligence on its part, and the proximate cause of the injuries and damages of appellee; that appellant negligently failed to warn appellee of the danger in handling the ties or that they were poison, as it was its duty to do, and had they so warned him he would not have handled the same, unless he had been furnished with proper appliances therefor. Appellee alleges his ignorance of the poisonous character of creosote and of the danger incident thereto; that he had never handled ties so treated; that under the circumstances appellant subjected appellee to an extraordinary and unusual danger, which was not incident to the risk assumed but was the result of the negligence of the appellant aforesaid.

The appellant answered, admitting that appellee was a section foreman, and that it was his duty to cause the unloading of the ties for the purpose of repairing the road, and that its ties were treated with a creosoted preparation, used for the purpose of preserving the wood, but denied that it knew the same was a poison or dangerous to the health or life of the employé handling them. It denies that appellee was poisoned or injured in any wise as alleged; that if he has suffered from such ailments and afflictions they did not originate from the handling of ties, but the same, if they exist, were due to the physical weakness of appellee and to inherent conditions wholly disconnected with handling creosote ties, as alleged by appellee, and for which appellant was not responsible. It is alleged that by reason of the appellee's duties, requiring him to handle creosote ties, if they were dangerous he knew thereof

and well knew the effect on the skin and flesh and all dangers incident to handling them.

The facts in this case tend to show: That the appellee was, on the 27th day of May, 1912, and some time prior thereto, in the employ of appellant as section foreman, and as part of his duty under his employment he was required to handle and unload ties for his employer. That on the 27th day of May, 1912, appellant shipped creosoted ties to be unloaded on the section of the road under appellee's charge as foreman. The evidence tends to show that ties so unloaded "were wet, dripping, and sloppy," and that appellee, at the time, had a pair of canvas gloves on his hands, which soon became saturated with the fluid from the ties and to such an extent that appellee removed them from his hands, and that his hands and face immediately began to burn. The skin on his hands peeled off, was rough, and, as explained by some of the witnesses, sloughed off. His hands and face were swollen and continued so up to the trial. After the time mentioned, on the 27th, he was unable to do manual labor, and some few weeks later, his employer, appellant, sent him to the sanitarium at Topeka, Kan., where he was treated for a short time and returned home, but the disease remained the same with reference to his ability to work. The appellant, however, again employed him in November following the injury in May, as foreman, in which capacity he was continued until March, 1913, when, owing to his physical condition, he was relieved and another man put in his place, since which time he has had no employment and has been unable to labor. The allegations in his petition describing his physical condition at the time of the trial are amply sustained by the evidence; in fact, it is practically uncontroverted. The evidence also tends strongly to show up to the time of unloading the ties on the 27th of May, 1912, his physical condition was good, and that up to that time nothing was observed wrong with reference to his hands or face, but since which time they have been swollen, red, or peeling off. His general physical condition has been on the decline, and one doctor stated since he first examined him appellee had declined nearly 75 per cent. The evidence tends to show that appellee never before handled creosote ties when they were "wet, dripping, and sloppy." He had handled creosote ties for several years previous to these, but did not know that creosote was poisonous or dangerous, and had never seen or heard of it blistering the hands or face before this occasion. The ties which he had handled previous thereto had been dried. When handled the fluid did not adhere to the hands or face. The evidence shows that appellant extensively used ties treated by creosote, but the formula used in preparing the solution is not given. It is shown that appellee was not warned that creosote used in treating ties was a poison, or that it was dangerous or injurious to the health or to persons when brought into contact therewith.

Dr. J. T. Stone, who is the son-in-law of the appellee, testified that he graduated from the Tennessee Medical College, Knoxville, Tenn., in 1906, and took a postgraduate course at Chicago, and at the time of testifying was the local surgeon for the El Paso & Southwestern Railway Company at Corona, N. M. In the course of his practice he had treated persons who were injured by creosote ties or timber when in its first stage. He stated that in his opinion a man who handled wet creosoted ties, which had been recently treated by creosote, would be liable to be poisoned by it. After stating his examination of appellee's case some time after the alleged poisoning, and after giving the history of the case, he testified that he judged appellee was poisoned by creosote ties, and the injury to appellee is permanent. He further testified:

"When creosote is absorbed into the system externally, you might call it dermatitis—it would last forever. I do not know that the creosote would remain in the system always, but it would cause bad results in the system that would remain there always. When any poison is taken into the system, either through the mouth or absorbed through the skin, which does not result in killing immediately, it might be eliminated from the system, but you may have the poison from the kidneys and it would remain. I don't know that you would have the effect of the poison in the system, but would have the effect of the poison. As an effect of the poison you might have nephritis or kidney trouble, and might have a disability for life."

He testified he had not made an analysis of creosote, but got his knowledge from the books.

"The first effect of creosote poisoning that I have seen is escharotic of the skin. It burns the skin so that it will slough, swelling and burning to beat the band—term it any way you want to. It is something like sunburn, only lots worse. The skin reddens and peels off. It penetrates, and the hands will swell. There is a red swelling and peeling off of the skin which lasts quite a while, if it is not counteracted. In some cases, as well as I remember, they would have swelling for months or so, and the first symptom goes from them. Of course the swelling would subside a little, but go out and get a little warm from exercise and it would probably swell again. That would be from handling creosoted ties."

The witness was testifying from his actual experience in treating cases. He testifies to having treated 30 or 40, and that he had been in where others were treating it. Again he testified:

"I understand that those ties after they have been treated, have to be held a number of days before they are sent out. * * * I think it would depend on the nature of the ties and how long since they had been treated whether some men could handle it and it not affect them at all. * * * It is a fact that the effect of creosote on the human skin varies like the sun, and some it affects and some it does not."

The effect of this testimony, in so far as his own observation was, the first symptoms

mentioned and described by him, he did not recall a case that had gone as far as appellee's, but that what had been written in the books, "like any other cases, they say it may do this or that; they do not come out positive and say." He did not know of a case like appellee's reported in the books.

Dr. Oliver who treated appellee from the beginning of his trouble testified after he treated him for two months he reached the conclusion that his trouble was from creosote poison. When the patient first came to him, he pronounced the trouble pellagra. He further testified:

"If appellee handled wet ties and it got on his hands, the effect of creosote poisoning would be to burn the skin and make it swell up and make it slough off, if it was burning to that extent, and make it sore. I am not able to tell you whether it would have any effect on the person in any other way." He stated the injuries were permanent.

"I don't think he has pellagra, because after I had been treating him for something like two months, I don't think he developed the symptoms that pellagra would develop. He had no salivation; no excessive secretion from the mouth; and I failed as I thought in the beginning—his mind was becoming demented somewhat. After I treated him for some months I decided that his mind was not failing."

The witness very frankly testified that he had never seen a case of pellagra or a case of creosote poisoning before this one, and all he knew of the diseases was that obtained from the books; that the effects of creosote poisoning were meagerly treated in the books. He, however, as is gathered from his evidence, adhered to the opinion that the case was not pellagra, but was, in his opinion, creosote poisoning. But had never seen or read of a case from creosote like appellee's.

The appellant introduced Dr. Kaster, chief surgeon of the hospital association of the Santa Fé main line, including six hospitals at different points. The witness was connected with the hospital at Topeka, Kan. He testified:

"In my capacity as chief surgeon of these various hospitals, I have had occasion to observe patients who were affected by creosote coming in contact with their flesh and skin. I should think I have seen over 30 in all my observations and all my practice. We average about 120 to 150 patients a day in the different hospitals every year. * * * Only a certain line of employés would handle creosote— the trackmen and the bridgemen. All the patients I have seen that were affected by handling creosote were affected alike. They began to notice a trouble with their hands and a burning sensation, and the intigument of the hands is swollen, the skin is inflamed as a result of the irritation produced by creosote or the chemicals used in treating the timbers that they had been handling. The patient would be given a hot application frequently applied to the skin, with boracic acid solution, which seemed to relieve the trouble, and in the course of a few days all disappeared or at least appeared much better, and the patient would be furnished with an ointment of boracic acid and allowed to go home. There is not any other condition of that disease other than the burned condition of the hand. I have never known a permanent injury to follow a creosote burn, and I have never known of any one being poisoned by an outward application of creosote. I have seen, as I tell you, a few patients in the hospital who had an irritation of the skin, produced by creosote; but, as to having seen patients poisoned by creosote who absorbed the remedy through the skin, I never heard of it. When a man is poisoned by creosote, it is bound to produce certain constitutional effects, and I have never seen one poisoned by creosote administered either internally or externally. If one should become poisoned by creosote either internally or externally, it would immediately have certain constitutional effects to show for it. The result of a poisonous dose would be that the man would become very much depressed and have smoke-colored urine, and would have very slow pulse and a very all gone feeling, so much so that he would have to lie down. He would be simply flattened out. If a man had a sufficient dose of creosote either from external or internal application, it might kill him, and he would die in a day or two. If he had a dose from which you stimulate him, nature would throw off that in a day or two, and the man would recover and no bad effect follow. I do not know of any case of creosote poisoning by observation, although I think it would be possible. I think it would be possible for you to saturate and cover the entire body with a creosote solution of creosote and oil, and I think you could get a constitutional poisonous effect. It would be possible. It would have to be very extensively applied and remain so applied for some length of time so it would be absorbed through the skin."

He further testified that poison is a condition and not a disease, and, when it is taken either by the mouth or by absorption, it is a poisonous substance which nature would eliminate. He further testified:

"I think the gentleman is suffering from pellagra."

He states his opinion from seeing the man and hearing the recitation of his symptoms and his condition since May, 1912. He stated that he does not know that pellagra is becoming more prevalent in the United States than formerly but that the medical profession has only studied the disease since 1906 and 1907 extensively. Pellagra has been recognized in Italy and the South a great many years, and has not been recognized in this country before 1900, anyway 1906, possibly—comparatively recent. In speaking of the symptoms of pellagra, he said:

"One of the symptoms may be less marked than in some other case, but there are principal conditions upon which the diagnosis is made: The irritation of the hands or skin, the dermatitis is recurrent, its limitations and its similarity on the two sides. Not only is it similar on the two hands but is similar on the two sides of the neck. It is similar in the distribution about the two sides of the forehead. The distribution of the skin lesions in pellagra is always alike on the two sides, and the area of the skin involved is well marked. The change from the diseased area to the normal area is always well marked, and it is so in this man's case."

Upon cross-examination of the witness it was developed that he had previous to the trial given his deposition in this case. He testified at the trial that he had no recollection of having examined Mr. Collins in the hospital, but he thought his deposition was given from the report made by the doc-

tors in the Topeka hospital. In his answer to an interrogatory, asking him to state if he examined Collins on his arrival at the hospital or during his stay there, or saw him, then to state his trouble or complaint. He answered:

"He arrived at the hospital on the 27th, and that day or the day following, the 28th, in company with Dr. Freeman, examined Mr. Collins, and he stated that his trouble from which he came to the hospital began in May, 1912, while he was unloading, or during the time he was unloading, some ties which had been treated with creosote. He claimed that his hands had a burning sensation, no itching, and stated that his nose had been affected in the same way and at the same time. On examination, we found that the backs of his hands were inflamed— reddened. The hands were not swollen at any time we examined him, and there were no blisters on the skin. The skin was simply reddened, inflamed, and irritated; and I could easily believe his statement that it was a burning sensation. At the time there was little, if any, evidence of trouble in his face. His bowels were regular, his appetite was good, digestion good, and he slept well. His mental condition was normal at that time. At the time, judging from the man's statement that he had been handling creosoted ties, and from the condition of the skin as we saw at that time, we thought that the man had evidently some irritation of the skin, that might have been produced by the handling of creosoted ties, as we have seen other cases similar."

He further testified in the deposition:

That they treated Collins for inflamed or irritated skin on the back of his hands and forearms, and that his general condition was good; that Collins had dermatitis, which simply meant an inflammation or irritation of the skin. "And the form of dermatitis from which Mr. Collins was thought to be suffering is a local manifestation, and from his history we thought it to be due from an irritation of the skin; that irritation of the skin could be continued by the application of a local irritant indefinitely. It is not a constitutional trouble, and in this particular the symptoms complained of were a burning of the skin, which is about the symptoms he had, due to dermatitis. It is not a constitutional disease, and tends to recovery with the removal of the cause."

He testified when Collins was discharged his skin was apparently normal. He stated at his examination in August, 1912, they did not discover any other disease, and that he (appellee), did not complain of any other trouble at that time, other than the inflammation of the skin, and that at the time he considered his ailment cured. In the deposition he testified in answer to an interrogatory:

"A patient with pellagra the first symptoms noticed are the disturbance of digestion, loss of appetite, and usually an irritation of the skin on the back of the hands."

After existing a year or two the patient has more disturbances in the bowels. The disturbance to the skin is confined to the back of the hands, the forearms and in some cases the disease appearing in the face, etc. On a trial of this case, on cross-examination he testified a man affected with pellagra, who should handle creosoted ties, and got his hands very wet, which burned the skin immediately, reddening it, and made blisters on his hands and face, would not help pellagra any, because any irritant to the skin would make it worse and make it more difficult to cure as long as the irritant was applied. He said he did not think they ever had a case of pellagra in the hospital that was recognized.

Drs. Vineyard, Miller, and Haney, in company with Dr. Kaster, examined appellee at the trial, and afterwards testified that in their opinion he was then suffering from pellagra. They stated they did not know the cause of pellagra, and that the medical writers or books had not stated any known cause for it. It was shown the creosote used in treating ties was a mineral product, and the doctors testified it is a poison, but they have never heard of it producing any permanent disorder; that it will produce a rash that will get well as soon as the cause was removed.

Several witnesses who had been engaged in the work of treating timber with creosote solution, and who had handled ties after being so treated, testified that they had never received any injury from such work, and had never seen men injured therefrom, except a slight burn comparing to a sunburn, even though they were thoroughly wet with it, and their clothing wet with it while on their persons.

The appellee introduced the deposition of Dr. M. L. Bishoff, taken by appellant, as follows:

"My name is M. L. Bishoff; occupation, surgeon; place of residence, Ft. Madison, Iowa. I have been engaged in such occupation for 12 years in hospital work. I am a graduate of the University Medical College. I have been connected with the Santa Fé Hospital Association in Topeka and assistant surgeon for 11 years, and on October 15, 1913, was transferred to Ft. Madison Hospital. Robert Collins, who in the year 1912 resided at Texico, N. M., and during such year was section foreman for the Pecos & Northern Texas Railway, the Atchison, Topeka & Santa Fé Railway Company, or the Eastern Railway Company of New Mexico, at said place, came under my observation. He remained at the hospital from August 27th to September 3d. Mr. Collins was suffering with an infection of the skin, the technical name of which is dermatitis. Dermatitis is an inflammation of the skin. In Mr. Collins' case it was restricted to the dorsal surface of both hands and forearm. We have both acute and chronic forms of dermatitis. The acute form is usually due to some immediate irritation, and recovery is rapid upon the removal of the irritation. The chronic form is usually the result of some continued application of irritants, and may last indefinitely. I know of no reason why Mr. Collins, if afflicted with pellagra, should suffer symptoms unusual to the course of pellagra, which consists of disturbance of the digestive system, of the skin and nervous system. These disturbances to the digestive system are loss of appetite, indigestion, diarrhœa, and a burning sensation in the stomach and intestines. The disturbances of the skin are erythematis dermatitis; of the nervous system, headaches, pain, loss of control of the muscles, and later of the mind. The disease develops by successive attacks, usually occurring in the spring, and maturing toward the fall or cold weather, and recurring the following spring with greater severity. * * * Handling creosoted ties might increase the inflammatory condition. It would not cause permanent injury."

In addition to the quotations heretofore made from Dr. Stone's evidence, we add the following:

"The medical authorities say the symptoms of creosote poisoning are practically like carbolic acid—all the symptoms—but you don't have the convulsions like carbolic acid. I do not know whether I can refer you to a medical authority that says it manifests symptoms other than like sunburn. * * * I do not remember of any case recorded in the medical books or any case from my own observation and experience and practice where a man, from handling creosote timber treated with creosote, would have the trouble and the ailments and the conditions which I now find and see in Mr. Collins. There is not a great deal of writing on creosote, because they have not been using it a great many years. I do not know as I know of any such case, and I can't cite you to any such case on record. I do not know that I can cite from the medical books any case on record where a man has shown trouble involving his nervous system, involving his digestive organs, and involving his intestines and other vital organs of the system from handling creosote timbers and handling creosote where the application is external."

The first assignment is that the court erred in refusing a peremptory charge to find for appellant; and the second assignment that the court erred in refusing to grant a new trial. The appellant presents propositions to the following effect: (1) The evidence was insufficient to show that ties treated as were the ties in question, were so poisonous as that handling them in the usual manner would cause systemic poison, by absorption from creosote, without which there could have been no actionable negligence in failing to give notice; (2) because the evidence shows the ties did not so poison appellee, but shows that he was suffering from pellagra; (3) if so poisoned, there is no evidence that appellant knew or should have reasonably anticipated that, as the natural and probable consequence of its failure to warn, employés would became afflicted with systemic poisoning as a result thereof; (4) that the evidence shows the ties were oil-treated ties; (5) that appellee, by his previous handling of ties so treated, knew of its effect, and therefore assumed the danger incident thereto.

[1] It is a general rule that the employer is not charged with the duty to instruct the employé as to the rules of the service or warn him of the danger incident thereto, unless the servant seeks information. The reason is a person entering upon the employment of another holds himself out as understanding the business in which he proposes to engage; hence he must be held to assume all the ordinary risk incident thereto, and it is not the duty of the master to warn or instruct him as to such dangers, unless information is asked. I. & G. N. Ry. Co. v. Hester, 64 Tex. 40L, M. P. Ry. Co. v. Watts, 63 Tex. 549 ·. Galveston, etc., Ry. Co. v. Arispe, 81 Tex. 517, 17 S. W. 47; San Antonio Gas Co. v. Robertson, 93 Tex. 503, 56 S. W. 323.

[2] The rule is equally as well established that:

"The servant being inexperienced and ignorant of the dangers of the service upon which he was just entering, it was the duty of the company to have informed him of these dangers. The law is thus stated by a well-known text-writer: 'Where there are hazards incident to an occupation, which the master knows of or ought to know, it is his duty to warn the servant of them fully for any injury that he may sustain in consequence of such neglect, and this rule applies even where the danger of hazard is patent, if through youth, inexperience, or other cause the servant is incompetent to fully understand the nature and extent of the hazard. Wood on Master and Servant, 714.'"

And our Supreme Court has applied this rule where the service required of the employé is unusual and out of the ordinary, which would render the usual method dangerous in the particular instance. M. P. Ry. Co. v. Callbreath, 66 Tex. 526, 1 S. W. 622; Mo. P. Ry. Co. v. Watts, 64 Tex. 568.

[3] If the ties shipped for unloading were treated in the usual and ordinary way, and were in the usual and ordinary condition when shipped, and if the burning of the hands of the men handling the ties in that condition was ordinarily incident to the work, appellee assumed the risk of injury and could not recover for such injury. San Antonio Gas Co. v. Robertson, 93 Tex. 503, 56 S. W. 323; Duerler v. Dullnig, 83 S. W. 889; Dullnig v. Duerler (Sup.) 87 S. W. 332. If the appellee knew that the ties would burn his hand in the condition they were in, and that was an ordinary incident to the work, he will not be authorized to recover because in law he assumed the risk.

[4] The risk assumed here referred to should not be confused with the risk incurred from the negligence of the master, modified by article 6645, R. C. S. A risk ordinarily incident to the employment of a railroad employé is a risk of injury that does not grow out of an act of negligence on the part of a railroad or its servants. Railway Co. v. Kelly, 98 Tex. 123, 80 S. W. 79; Railway Co. v. Lewis, 133 S. W. 1086; Myers v. Railway Co., 134 S. W. 814.

[5] The facts are sufficient, we think, to authorize the jury to find that the usual method of delivering creosoted ties to be unloaded was to dry them before shipping, and that in shipping ties wet and dripping with creosote was unusual and out of the ordinary. That the facts are sufficient to authorize a finding that ties wet and dripping would burn the hands or any portion of the body of the man coming in contact with ties in that condition. That the ties handled by appellee on May 27, 1912, were wet and in an unusual condition, and that they burned appellee's hands and face. That at that time he did not know such an injury would result from handling them. That appellant knew, or should have known, that ties so treated was a poison which would burn the hands coming in contact with the skin. That appellant did not notify appellee of such danger, and, failing to do so,

it was negligent to that extent, and as a result thereof appellee sustained injury to his hands and face. Gulf, etc., Ry. Co. v. Smith, 148 S. W. 820; Texas & N. O. Ry. Co. v. Gardner, 29 Tex. Civ. App. 90, 69 S. W. 217; H. & T. C. Ry. Co. v. Rutland, 45 Tex. Civ. App. 621, 101 S. W. 529; Cunningham v. Chicago, etc., Ry. Co., 156 Mo. App. 617, 137 S. W. 601.

[6] The important question, however, in this case is: Assuming that creosote is a poison, and so recognized by the chemist or medical world, but, as noted by them, all the known effect of such poison, when applied to the skin, is a burning sensation compared to a sunburn, and never known to the profession or treated by standard authorities as producing constitutional disorders, or systemic poison, whether an employer be charged with negligence in failing to warn of such danger when he did not know and could not know that a constitutional disorder would result from such a use; in other words, was such an injury incidental to the wrong done, and was it such as may have reasonably been supposed to have entered into the contemplation of the appellant? The rule, as we understand it, in this and in other jurisdictions, is:

"A defendant should be held liable for such injuries to the plaintiff as are the natural consequences of its negligence, or such as ought to have been contemplated as a result of its negligence. But, to express the rule in the negative form, it cannot be liable for unforeseen consequences of its acts or such as could not be said to have been the usual and probable results of the condition produced by the negligence of the defendant, because, in such case the defendant's negligence is not the probable cause of the injury." Reynolds v. Galveston, etc.. 101 Tex. 2, 102 S. W. 724, 130 Am. St. Rep. 799; Seale v. Gulf, etc., Ry., 65 Tex. 274, 57 Am. Rep. 602; Texas, etc., Ry. v. Bigham, 90 Tex. 223, 38 S. W. 162; Jones v. George, 61 Tex. 345, 48 Am. Rep. 280.

We are aware that the above-cited cases are not cases arising from disease or injury produced by poisoning, but we nevertheless think the principles announced applicable in determining the question of liability for the constitutional disorder or disease contracted by appellee.

It will be noted in the Smith Case, 148 S. W. 820, and the Cunningham Case, 156 Mo. App. 617, 137 S. W. 601, supra, the creosote was splashed in the eye, and in the solution and quantity then existing that it was not only possible but probable, that it might be splashed in the eye while lifting ties, and, from the known effect of the ingredient, it would probably produce the injury complained of.

In the Gardner Case, 29 Tex. Civ. App. 90, 69 S. W. 217, supra, the strongest case we think cited by appellee, it is held that it having been proven that, if potash and lead produced the deleterious effect on the employé, the evidence was sufficient to submit the case to the jury. In that case we find no question made that the effect from those poisons, such as there complained of as received, were not probable. The only question made was whether he was injured as alleged, or whether his condition was not from the pulmonary trouble.

In the Rutland Case, 45 Tex. Civ. App. 621, 101 S. W. 529, supra, there appears to be no question that the fumes from the chemical there used will produce death; and hence such a result was probable. It is true in some of the cases it is said by the courts, in passing on the question, that such a result was not shown to have theretofore been known to occur. Not in any of the cases is it contended the poison would not have produced such an effect. In this case the decided preponderance of the evidence is that appellee's condition could not have been produced by an external application of creosote. Not only that no case was known, but such effect would not be produced from the nature of creosote as a poison. Two doctors for appellee testified that in their opinion his condition was from creosote poison. They admit they never saw a case in which creosote produced such an effect, never heard of one, and no book or standard authority gave as a result such a condition from creosote. They base their conclusion upon the history of the case as given by the appellee alone, as we gather from their testimony, and not, as we understand, from a scientific opinion based on the toxic effect of creosote.

[7] It is a general rule that an employer is not liable to the servant for injuries caused by abnormally dangerous conditions, unless it is proven that the existence of those conditions was either actually known to the master or would have been known to him if he had exercised that degree of watchfulness which he was bound as a prudent man to exercise under given circumstances. La Batt's Master and Servant, § 1025, vol. 3; Corcoran v. Wanamaker, 185 Pa. 496, 39 Atl. 1108. The injuries shown in this case from creosote were, from the testimony, abnormal. No such is shown to have ever occurred before. How can it be said appellant knew or should have known such effect would follow from coming in contact with creosote? If the testimony of all the doctors in this case is true, an inquiry from the scientific world would not have revealed such result possible, at least probable. As a prudent man was required to act, he could not ascertain such a probable result. If this is correct, there could have been no reasonable anticipation thereof, and the negligence of appellant is not the probable cause of the injury. We believe the case of Pinkley v. Chicago, etc., Ry., 246 Ill. 370, 92 N. E. 896, 35 L. R. A. (N. S.) 679, announces the correct rule, and, as we view it, is decisive of this case. As we understand that case, the employé could have recovered for the damages sustained by burning his hands from handling creosoted ties, had he not known that such would be the result from so

handling them. In this case, however, the jury having found that appellee did not know creosote would burn the hands, for such an injury he could recover, for the reason that the evidence shows that appellant knew or should have known that such would be the probable result. But we do not think the evidence shows that appellant knew or should have known that creosote coming in contact with the skin would be taken into the system and produce a constitutional disorder, such as alleged in this case. It is said in the Pinkley Case, supra:

"Under such circumstances, a finding that appellant knew, or by the exercise of ordinary diligence might have known, that the coal tar preparation was liable to produce the injuries of which the appellee complains, is manifestly without any evidence whatever to support it. If the appellant did not know, or by exercising ordinary diligence could not have known, that such injuries were liable to result, then the law did not impose any duty upon it to warn appellee of the danger of receiving such injuries, before or at the time of giving the order which appellee alleges was negligently given."

It is said in the Gardner Case, 29 Tex. Civ. App. 90, 69 S. W. 217, supra:

"It by no means follows that surface burns and stinging sensations produced by particles of the liquid would put a man of ordinary information on notice that he was in danger of poison by absorption."

While this language was used with reference to the servant, yet we think when it is shown by experts, and all the experts, that all the known effect of an external application of creosote was a burn on the skin, that the master cannot be said to have been negligent in failing to anticipate a sporatic constitutional injury from the mere fact that creosote sometimes burns the skin.

[8] Appellee insists that appellant must have anticipated some injury to appellee, and that, while he could not ordinarily have anticipated the injury alleged, nevertheless it would be liable because some injury would probably result. The test is whether a reasonably prudent man, in view of all the facts, would have anticipated, not necessarily the precise actual injury, but some like injury. In one of the cases cited by appellee (H. & T. C. Ry. Co. v. Leslie, 57 Tex. 83) it is said:

"The liability of the defendant is measured by the fact that the injury received follows proximately from the culpable act complained of, and, if the erysipelas sprung from the injury, the dangers from that disease, as well as the suffering produced by it, constitute a portion of the injury itself."

We do not think the evidence in this case sufficient to show that appellee's condition was a resultant disease, caused from the burn on his hand; in other words, that the known effect of a creosote burn would ordinarily or probably bring on a constitutional disorder. If the evidence warranted the finding that the burning of the hand and face set in motion disease to the appellee and gave to it its efficiency for harm, such first injury must rank as the preponderating cause, but at this point the evidence fails. The opin-

173 S.W.—17

ion of the doctors for appellee is that appellee was suffering from creosote poisoning. They do not, as we interpret the evidence, state that the hands and face were burned by creosote, and, as a natural and probable result therefrom, the vital organs of appellee were diseased. They simply make out, if anything, systemic poisoning, which, as heretofore seen, could not have been reasonably anticipated. If the disease was resultant from the injury, which could have reasonably and ordinarily been foreseen, the appellee's contention would be logical. We do not understand that a slight injury, resulting from negligence, will warrant a recovery for a disease afterwards developed, unless it shall be shown by proof that such latter condition would naturally or probably develop therefrom; and to make the employer liable it must have been such that he should have reasonably anticipated that it could or would probably so result or have a like result. So at last the theory of appellee on this point harks back to the proximate cause. Heiting v. Chicago, etc., Ry. Co., 252 Ill. 466, 96 N. E. 842, Ann. Cas. 1912D, 451.

The fact that appellee's condition is a serious one, it will not necessarily follow that the hands burned by creosote produced it, though the opinion of the two doctors may have warranted the jury in finding as a fact it did. The evidence is yet lacking to show that such injury could or would reasonably have been anticipated, and that appellant did know or should have known thereof, and therefore, in order to prevent it, have warned appellee of such danger.

It is manifest from the pleadings, the charge of the court, and the verdict of the jury that damages were awarded appellee to compensate him for constitutional disorders. This, under the evidence, we do not think he was entitled to recover, but we think, under the evidence tending to show injury to the hands and face from the creosote, and the facts charging appellants with knowledge of such result, and appellee's want of knowledge, would authorize a recovery for such an injury.

Under the view we take of this case, it will not be necessary to discuss other assignments, and the case will be reversed and remanded.

### On Motion for Rehearing.

[9] Upon this motion we desire to cite the case of Galveston, H. & S. Ry. Co. v. Powers, 101 Tex. 161, 105 S. W. 491, on the proposition that jurors are not permitted to be turned loose in the domain of conjecture as to what may possibly ensue from a given statement of facts. The verdict must be based upon evidence that shows a reasonable probability that the injury will produce a given effect.

The motion for rehearing and to certify are overruled.